**McFarland, *et al. vs* McKnight.**

Error to the Louisville Chancery Court.

                    *Attachment.    Steamboat.    Constitutional question.*

*June* 19.      Chief Justice Ewing delivered the opinion of the Court.

The errors assigned draw in question only the consti-
tutionality of the three acts of the Legislature of Ken-
tucky, noticed in the opinion of the Chancellor, and raise
no question against the form of the decree.    This Court
has already sustained the constitutionality of the acts re-
ferred to, in the case of *Church, et al.* vs *Chambers,* (3
*Dana*, 274.)    We still adhere to that opinion and concur
with the Chancellor substantially, in the opinion which
he has delivered, and approve the conclusion at which
he has arrived.    We deem it unnecessary, therefore, to
add any thing to what he has said, but direct the report
of his lucid argument, and the result, as the opinion of
this Court.

The decree is, therefore, affirmed.

Chancellor Bibb's opinion.

The Court being now advised, deliver the following
opinion and decree in this case, and the case of Oldham
against McFarland and others:

These suits are against the owners and master of the
steamboat Versailles, for having taken on board, in the
Circuit of Jefferson, of this State, and transported be-
yond the limits of this State, a female slave called Ruthy,
the property of McKnight, and a man slave called Thorn-
ton Blackburn, the property of Oldham, as is alledged,
to the great damage of the respective owners.

The actions are prosecuted under three several statutes
of this Commonwealth, the first to prevent masters of
vessels and others, from employing or removing slaves
from this State, approved January 7, 1824, (1 *Digest by
M. & B.* 259;) the second, supplemental, approved
February 12, 1828, (1 *Digest,* 260,) the third directing
the trial of the facts necessary to sustain the action and

the assessment of damages to be by a jury, approved
*page* 106.)

By the act of 1824, it is enacted, "that any master or commander of a steamboat or other vessel, who shall hereafter hire, or employ, or take as passenger or otherwise, out of the limits of this State, or shall suffer to be hired, or employed, or taken as passenger on board of such steamboat or other vessel under his command, or in his charge, or otherwise take out of the limits of this State, any person or persons of color, unless such colored person or persons shall have in their possession the record of some Court of the United States, properly exemplified, proving his, or her, or their right to freedom, or unless such master shall have the permission of the master of such person or persons of color, for such removal, every such master or commander of a steamboat or other vessel, shall be liable to indictment, fine and imprisonment, at the discretion of a jury, and shall, moreover, be liable in damages to the party aggrieved by such removal, and the steamboat or other vessel in which such colored person or persons shall be employed, hired, or taken as passenger or otherwise removed out of the limits of this Commonwealth, shall be liable to the party aggrieved by such removal, and may be proceeded against by suit in chancery, and condemned and sold to pay and satisfy such damages and the costs of suit."

The supplemental act of February 12, 1828, extends the provisions to the "owners, mate, clerk, pilot, and engineer of any steam vessel, as well as to the master, and they shall all be liable to indictment, or to action of the party aggrieved, either jointly with the master or severally, and either at law or in equity." "Sec. 2. *Be it further enacted,* That the liabilities under said act, shall accrue whenever the person of color shall be taken on board any steam vessel, from the shores of the Ohio river *opposite to this State,* to the same extent as if they were taken on board from the shores or rivers within this State, and the like liability shall occur for landing or suffering them to go ashore within as without the State; *Provided,* Nothing in this act, or the act to which this is an amend-

<div style="margin-left:2em">

**McFarland, &c.**
*vs*
**McKnight.**

The *persons of color* referred to in the statutes of 1824 and 1828, (1 *Stat. Laws*, 259 and 60,) mean such persons of color as are slaves only.

Process served on the owners of the boat.

Answer of the master of the boat, contesting the constitutionality of the statutes of Ky. of 1824 and 1828.

</div>

ment, shall be so construed as to apply to any person of color who is not a slave."

Although the acts of 1824 and 1828, employ the phrase, persons of color, and contain a warning to the owners and masters of steam vessels on the Ohio river, grounded on the historical facts, and political institutions respecting the introduction of such persons of color into the colonies, and their general condition as slaves, that such persons of color are to be deemed slaves *prima facie*, from their color, and thereupon to require that they produce exemplifications of their right to freedom : yet from the body of the enactions, as well as from the express proviso'in the supplement, it is evident that neither statute can be applicable to any colored person, but one who shall turn out to be actually a slave at the time of the asportation by such steam vessel. The plaintiff must establish his right of property.

The process of subpœna to answer these cases respectively, were returned executed by the officers on all the defendants, master and owners of the Versailles. The owners have not answered, although personally served with process within the jurisdiction of the Court.

The master, Munroe Quarrier, has put in his answer, admitting that he was master of the steamboat, Versailles, at or about the time stated in the bills respectively, and that Thornton Blackburn and his wife Ruthy, persons of color, whom he supposed to be free, were taken on board the Versailles, from the Indiana shore of the Ohio river, on a trip of the Versailles up the river. He denies that he then had or now has knowledge that they were slaves, and demands the proof. He farther says, "that he is a citizen of Virginia, and was at the time engaged in lawful navigation and commerce, with said steam boat, as master, on the Ohio river, under the laws and regulations of the United States, and insists, that although the plaintiff may succeed in establishing that the negro taken on board the Versailles was his slave, yet that the law of Kentucky, under which the complainant expects to recover, is, so far as it applies to this case, unconstitutional and void." An agreement is filed in each case, "that the slave, if taken at all, was taken from the shore of the Ohio, adjoin-

ing the State of Indiana, and that the steamboat, Versailles, belonged to the port of Wheeling, in Virginia, and that the officers. of the boat, and a part of the owners, were citizens of Virginia, residing there, and the other owners citizens of Kentucky." This suit is in chancery, against the steamboat, master, and owners only, for the damages to be assessed by a jury, if they find the allegations of the bills respectively, to be true. Two of the defendants gave bond to perform the decree that should be made.

I shall not discuss every abstract question that might, by possibility, arise under those statutes, but shall apply the reasoning to the remedies now pursued in a civil suit for damages, to be tried as to the facts and the damages, by the inquest of a jury, against the owners of the steamboat Versailles, and the master of that boat. The facts are, that these negroes were slaves, the woman the property of McKnight, the man the property of Oldham. The owners of the slaves resided in Louisville, the slaves ran away from their owners, and on the next day, the steamboat Versailles, having just before left the port of Louisville upon a trip up the Ohio, upon being hailed by these negroes from the Indiana side of the river, was checked in her headway by taking off the steam, and whilst the boat Versailles was floating in the Ohio river, but a short distance above Jeffersonville, (which town is opposite to Louisville,) the two slaves were taken on board, registered as passengers on the books of the Versailles, conveyed on board to Cincinnati, and there landed, whereby they have been lost to their owners.

Upon what grounds the counsel for the defence would question the validity of the acts of the Legislature of Kentucky, or the rightful jurisdiction to apply the remedy as now pursued by the owners of the slaves, for damages, and in a trial by jury, although instituted by bill in chancery, (or whether by any, after seeing the facts as made out by proof,) I am not informed by written brief or oral argument.

The question may be considered under these general heads: I. The offence. II. The remedy. III. The rightful domain, sovreignty and jurisdiction of the State

of Kentucky over the *locus in quo*, as defined in the statute of the 12th of February, 1828, declaring the offence so as to enact the remedy and try the offenders.

I. As to the offence.—By the constitution and laws of Kentucky, Ruthy was the slave and lawful property of McKnight, and Thornton Blackburn was the slave and lawful property of said Oldham. The owners were lawfully possessed in Kentucky, of said slaves. Being so slaves and in possession of their owners in Kentucky, not emancipated, but unlawfully absconding and escaping from the service and employment of their owners, they remained the lawful property of their owners, within whatsoever State or place, within the United States, they should be found, after their escape from the service of their owners. The constitution of the United States recognizes this discription of property.

It is therein provided, (Art. 4, Sec. 2, par. 3,) that

Slaves escaping
from their own-
ers remain slaves
into whatever
State they may
be found.

"no person held to service or labor in one State, under the laws thereof, escaping into another, shall in consequence of any law or regulation therein, be discharged from such service or labor, but shall be delivered up on claim of the party to whom such service or labor may be due."

The act of the Congress of the United States, more effectually to carry into execution this provision of the constitution, need not be quoted.

The fact of transporting a slave beyond the reach of the

The act of the
Legislature of
Kentucky giving
the remedy by
suit in chancery
for the removal
of slaves from
the State by
means of steam-
boat, did not cre-
ate any new of-
fence.

owner, without the permission of the master, to his great loss and damage by the meddling and intervening of another officiously and importunely, is a wrong, an offence against the rights of property any where and every where in the United States. To take a slave so near to the master's pursuit and re-possession by officiously intermeddling, and transport him or her without permission of the owner, to distant parts, by a mode of conveyance so swift as to elude the vigilence of the owner to reclaim, is an offence, a private wrong to the owner, a cause of action for redress as clearly as to take away an apprentice, a horse or a box of goods. The place from, and to which, taken and transported unlawfully, or the species

of property so transported are matters proper to be considered in assessing the quantum of damage occasioned.

The wrong as predicated and defined by the statute is not any novel definition, but pre-existing, and if applied to goods and chattles generally, is a private wrong well known to the principles of the common law. The rights of property in things being declared, and the division between *meum* and *tuum* established, the principles of the common law, of the civil law, of the code of every civilized nation, would pronounce such an unauthorized, officious, injurous intermedling by one man with the property of another, to be an offence, a trespass upon the rights of property.

As to the facts agreed that some of the owners and the master of the Versailles were citizens of Virginia, and the vessel belonged to the port of Wheeling, the proposition need only be stated and the general assent follows to the self-evident truth, that no citizen of Virginia, owner, or master or officer of a steam boat or other water craft, belonging to the port of Wheeling, in moving up or down upon the surface of the Ohio river, in the channel or near its shores, in, or out of Virginia can have privilege, exemption or immunity by reason of his citizenship, or the port to which his boat belongs from punishment and redress for public or private wrongs.

Persons moving upon or using the Ohio river for the purpose of trade and commerce, out of their own State or port or place of residence, have not thereby privilege to commit murders nor robberies, nor thefts nor trespasses upon the persons, boats, wood, slaves, goods and chattels of others which they may see upon the shores or waters of the Ohio.

The actings and doings described, denounced and forefended in the act of the legislature of Kentucky did constitute offences and wrongs, by the principles of the common law against the rights of such property as were known to the common law.

The particular species of property described in the act of the Legislature being known and established by the constitution and laws of Kentucky, is recognised and assumed to the owners in the constitution of the United States,

The fact that the masters & owners of a steamboat, carrying away a slave, which had escaped from his owner, are citizens of Virginia, carrying on commerce on the Ohio, does not exempt them or the boat from liability to the owner, under the statutes of Ky. of 1824 and 1828, or other trespasses or misdemeenors committed within the jurisdiction of Ky.

McFARLAND, &c.
*vs*
McKNIGHT.

as valid and to be respected in every State. The like ac-tings and doings as to goods and chattels would be wrongs by the common law. The act of the Legislature of Kentucky has not created any new offence or wrong, but has singled out a particular class of wrongs for the purpose of giving a more effective remedy.

II. As to the remedy provided by the statute, this may be considered under these heads: 1st. Against the own-ers. 2d. Against the master of the steam boat. 3d. The responsibilities of the owners for the act of the mas-ter. 4th. The process, *in rem*, against the boat.

The responsibility of the owners of steamboats for injuries committed personally, to the rights of others, rests upon general principles.

1st. As against the owners, who may personally have committed the wrong, their personal responsibility to the injured to redress the wrong, stands upon general principles well established as the universal rule of justice.

So does the responsibility of the master individually.

2d. As against the master who was guilty of the wrong, his responsibily personally for redress, stands upon the same general principles. Every one is personally res-ponsible to redress the injuiry which he shall himself have committed against the rights of another.

The responsibility of the owners for contracts made as well as for wrongs done by the masters of the boat, conducting their vessel, is based upon well established common law prinsiples,

3d. As to the responsibility of the owners for private injuries to others not done personally by them, but by the master in conducting their vessel. This responsibility of the owner for the private wrongs and trespasses of the master committed in the conduct of the vessel, entrusted to his command by the owners, stands upon principles well known and established. The master of a ship or steamboat is appointed by the owner or owners. The owners are responsible, civilly, for the faults and trespas-ses of the master appointed by them, and occasioned by the negligence or unskilfulness of the master in the con-duct and employment of the vesssel. "For security of individuals in society it is not sufficient that a man him-self be prohibited from doing mischief, he ought over and above to be careful and vigilant, that persons, animals and things under his power do no mischief, and if he neglect this branch of his duty he is liable to repair the mischief that ensues equally as if it had proceeded from his own act. With respect to servants, it is the master's business to make a right choice and to keep them under

proper dicipline; and therefore, if they do any mischief that might have been foreseen and prevented, he is liable. Thus if a passenger be hurt by my servants throwing a stone out of a window in my house, or have his clothes soiled by dirty water poured down upon him, the damage must be repaired by me at the first instance, reserving to me relief against my servant." "It is the duty of a man who carries stones in a waggon along the the highway to pack them so as to prevent harm; and if by careless package a stone drop out and bruise a passenger the man is liable." Such are the doctrines stated by Lord Kaims in his principles of Equity, (Book 1, part 1, sec. 2, p. 63–65.) The owners of vessels are not only liable for the contracts of the master, but also for his torts, when done in and by his employment and management of the vessel. If the master injures another vessel from his want of care and skill, the owner is liable for the injury as well as the master; *Bussy* vs *Danaldson*, (4 *Dallas*, 207;) *Purviance* vs *Angus*, (1 *Dallas*, 181; *Bee's adm. R.* 369;) *the Thames*, (5 *Rob. adm. R.* 345; *Roccus's notes*, 3–5–*XI*. An action will lie against the master for the injury done by his servant through negligence or unskilfulness, acting in his masters employ; as when the servant of a carman ran over a boy in the streets and maimed him; so when the servant of A. with his cart ran against the cart of B. which contained a pipe of wine, whereby the wine was spilled, the masters were made to pay for the acts of their servants, (1 *Lord Raymond*, 739, *anomymus*;) *Jones* vs *Hart*, (2 *Salk.*, 441.) In such cases if it be alledged that the defendant, the master, negligently drove his cart, the proof that his servant did it will support the declaration; *Brucker* vs *Froment*, (6 *Term R.* 659.

To an action on the case against several of the partners for negligence in their servant, whereby the plaintiffs's goods were lost, it cannot be pleaded in abatement that there are other partners not named; *Mitchell* vs *Tarbut & others*, (5 *Term R.* 649,) are generally in actions not founded on contract, but sounding in damages, *ex delicto*, the plaintiff may sue some or all who are liable. But as to the joinder or non-joinder of all the persons who are responsible, these are but questions of form.

As to the first, second and third of these heads of remedy afforded by the Legislature in civil actions against the owners and master of the vessel, either jointly or severally, for the private injuries done by the employment of the vessel, they are not departures from the former doctrines of the law in respect of injuries on land or water, in like cases.

4th. As to the process *in rem.*—The act makes the steamboat itself liable, on board of which the injury was committed by the unlawful employment of it for the purpose of conveying off the property of others against their will and without permission. This does but subject to the reparation of damages, the property of those who are, according to established principles, responsible for the injury.

All the owners are liable for the act of their servant and master, in so injuring others by the unlawful employment of the steamboat to transport their property beyond their reach. The personal responsibility of all, includes the property of all; and to subject the particular property used to commit the offence, so belonging to the wrong-doers, by arresting it, *in limine,* is no stretch of power, no unwarrantable or unconstitutional exercise of legislative authority, in providing remedies for injuries. It is a familiar species of remedy known in the maritime law, it is exercised in numerous classes of cases, by the Congress of the United States, and by the Legislatures of the several States. Steamboats are arrested and made liable for the penalties of running without inspection and certificate of the condition of the boilers. Vessels are seized and condemned for being engaged in an illicit or prohibited trade, or for breach of the revenue laws, or for other violations of law. Ships are liable by process *in rem,* for wages. Liens are given for repairs, &c., and so for building, the mechanics have, by the laws of many of the States, liens on the lands and buildings.

*The statute subjecting steamboats by a proceeding in rem, for injuries done by master, owners, &c. is but subjecting the property of those individuals who were responsible by well established principles, to the damages sustained by the injury, & is not an unconstitutional exercise of legislative power.*

III. As to the jurisdiction and rightful authority of the Legislature of Kentucky, over the place or portion of the Ohio river defined in the statute, to prohibit the offence, enact the remedy and try the offenders, in an action at the suit of the individuals injured.

The liabilities are, whenever a slave, without permis- <span>McFarland, &c<br>vs<br>McKnight.</span> sion of the master, shall be taken on board any steam vessel, from the shores of the Ohio river, opposite to this State, and transported and landed at some other place.

The offence is in taking the slave on board the steam vessel and transporting thereon and thereby. The transportation so done is the gist of the action. The steam vessel is the instrument and the Ohio river is the high-way of the transportation. The offence must be committed on a defined part of the Ohio river. The commencement of the offence is by the taking on board, from the shore of the Ohio river, opposite to this State, and is consummated by the transportation on board. Thus a particular part of the river, short of its whole length, is defined and limited for the place of the offence.

Formerly the State of Virginia owned the lands on both sides of the Ohio river, from the northern boundary line of Virginia to the mouth of the Ohio, and exercised over the river the right of domain, empire, sovereignty, and jurisdiction. This possession on both sides of the river, gave to Virginia, according to the principles of the law of nations, the domain, empire, sovereignty and jurisdiction over that part of the Ohio river flowing through her territory. The right of passage upon the Ohio river, through the State of Virginia, for the purposes of navigation, trade and commerce, which belonged to others not citizens of Virginia, as well as to her own citizens, was held in subordination to the general domain, empire, sovereignty and jurisdiction of the State of Virginia. Crimes and wrongs against the public or against individuals, committed and done on the Ohio, from the northern boundary of Virginia to the mouth, were properly cognizable by the State of Virginia, to prohibit, punish, and redress. The right of passage and use, for the lawful and innocent purposes of navigation, trade, and commerce, did not take away the sovereignty and jurisdiction of the State of Virginia, to legislate and prohibit those using the passage and water of the Ohio river, within her territory, from doing mischief to the State or her citizens, or foreigners or their property, within the limits of Virginia. Those who use the right of navigation, trade

*Virginia, before the cession of the territory north west of the Ohio, had jurisdiction of all crimes against the public, and wrongs done to individuals on the Ohio river; by the cession it was not relinquished.*

and commerce upon the arms of the sea, lakes or rivers within the territory of a State or Nation, are bound, whether citizens, subjects or aliens, to conduct themselves orderly, peaceably and innocently; (*Grotius War and Peace, Book II, chap.* 2, *sec.* 12 *to* 17, *p.* 151 ; *chap.* 3, *sec.* 18, *p.* 171 ; *Puff. Book III, sec.* 7 ; *Vattel, Book I, chap. XX, sec.* 245, *p.* 104; *chap.* 22, *sec.* 278, *p.* 115; *chap.* 23, *sec.* 289 *to* 295, *p.* 118 ; *Book II, chap. VIII, sec.* 101, 102, 105, *p.* 160, 161 ; *chap. X, sec.* 133, *p.* 171 ; *Bynkershoeck, chap.* 8, *p,* 60, *of edition by Duponcéan.*)

—But by the erection of Ky. into an Independent State, the jurisdiction upon the Ohio, to its north western shore, from its mouth to the Big Tandy river, passed to Ky. as formerly held by Virginia.

The State of Virginia ceded to the United States the territory lying north west of the Ohio river. By this cession the domain, empire, sovreignty and jurisdiction of Virginia over the river Ohio, did not pass, but remained in that State. By the erection of Kentucky into an independent State, by the compact between Virginia and Kentucky, and the limits assigned to the new State, and the assent of the Congress of the United States to that compact, Kentucky, as a State, became invested with the domain, sovereignty and jurisdiction over the Ohio river, from its mouth up to Big Sandy river, as fully as formerly held and possessed by the State of Virginia.

By this right of domain, sovereignty and jurisdiction, the whole power, legislative, executive and judicial, belongs to the State of Kentucky, over the waters of the Ohio river to the north western shore or bank, along its course from the mouth of Big Sandy river to the mouth of the Ohio river; and this power and jurisdiction is plenary, to define and to punish crimes and offences against the public peace, and to prohibit and redress wrongs, the better to protect and foster the proper and innocent purposes of navigation, trade and commerce. The act of Kentucky in question, is cautiously framed, so as to designate that part of the Ohio river which is within the limits and rightful jurisdiction of this State, and no more. It is a solemn duty which Kentucky owes to other States and Nations, and to her own citizens in particular, to take care that the right to use the river within her limits, for the innocent, commendable and rightful purposes and natural ends of navigation, trade

and commerce, be not perverted and abused to means of annoyance and mischiefs. This duty is incumbent on her as a civilized State, having place among the nations and governments of this earth; it is a moral duty which she owes, particularly to her own citizens.

The laws of every State, Nation or Empire have force within its limits. Neither the citizens of other States of this Union, nor the citizens or subjects of foreign States or Potentates have the right, whilst within the limits of Kentucky, to disrespect her laws, to commit wrongs, trespasses or damage upon persons or property within her limits. All persons and property within the limits of this State, during the stay, whether temporary or permanent, are under the protection of her laws. The jurisdiction of the Courts of this State cannot be exercised over persons or property unless found within the State. The statute under consideration, in giving the remedies against the persons and the things, must necessarily be understood as confined to such persons and to such things as shall be found within the State, subject to the process of the Courts.

There is nothing in these acts in giving remedies for the redress of wrongs committed upon the property of individuals by civil action for damages to the owner, which stretches beyond the proper territorial jurisdiction and sovereignty of the State. The *locus in quo*, as described in the statute, is necessarily *within* the rightful limits of the State. The offences prohibited must be within the limits of the State. The hailing of the boat from the land in the State of Indiana, is not the offence described in the statute, but the offence consists in taking of the slaves on board the steam vessel and transportation of them on the Ohio river, so commenced on that particular portion of the river described in the statute.

The original and supplementary acts are upon subjects deeply effecting the rights and tenures of property to a very large value. The great extent of the water boundary of this State, the rivers navigated by steam vessels into the interior of this State, the celerity of the movements of steam vessels, expose a very great amount of property in this State, to the mischief intruded to be

forefended and redressed. The property is valuable, the facility of transportation very great, the steam vessels are numerous, the persons owning and employed in conducting them more numerous. So that the aggregate value of property exposed to the heedless or vicious, the temtations and the persons tempted, and the facilities of committing depredations, collectively considered have called forth these legislative enactions. So far as the acts prescribed the redress for private wrongs by action for damages in law or in chancery, against the master and owners jointly, or severally or against the steam vessel to pay the damages, I see nothing to complain of neither as an usurpation of jurisdiction, nor as disturbing the lawful right to use the river, for the proper purpose of navigation, trade and commerce.

The form in which the remedies are given, either jointly or severally, at law or in chancery, has divested the process of some of those technicalities which have at times vexed the forums.

According to the evidence in these cases, respectively, the place on the Ohio river, where the steamboat Versailles floated when the slaves were taken on board, was clearly within the limits of this State, and within the county and circuit of Jefferson as charged in the bills respectively.

But the actions and remedies as permitted by the statute, are cognizable in any Court of the State within whose jurisdiction the persons or the boat may be found, amenable to the service of process.

The actions are not local, but transitory, following the persons, or the specific personal thing if the action be "*in rem.*"

The discussion in the case of *Fabrigas* vs *Mostyn*, (*Cowp.* 161,) and the luminous opinion of Lord Mansfield, is conclusive to that effect. Trespass for assault and false imprisonment, was maintained by a native of Minorca in the Court of England, for such injury committed in Minorca by the Governor of that island.

Independant of the statutes it seems clear to my mind that for the damage sustained by the plaintiff in taking and transporting the slave on board the steamboat, from

the place and in the manner stated and proved, an action at law in the Circuit Court of Jefferson, could have been maintained against these defendants found within the jurisdiction of the Court.

The statute has done no more than to give more complete and adequate remedy, either at law or in chancery, to the party agrieved.

Therefore, a jury is to be empannelled to enquire as to the facts, &c.

This suit was against the steamboat Versailles, and Munroe Quarrier, the master, and against all the owners. The boat has been restored upon bond and security to perform the decree; and so the boat is not now subject to the decree of the Court.

The suit being instituted against the boat itself, and the owners and the master, was well begun. The subsequent release of the boat from the arrest by bond and security, as permitted in the order for the arrest, and the removal of the boat thereby, from the jurisdiction of the Court to decree a sale of the boat, the decree must now be personal, with the right of the plaintiff to proceed upon the bond given to obtain the restoration of the boat after it had been arrested.

In framing a decree, the question arises, whether that personal decree shall be against the representatives of the deceased co-part owners, along with the surviving co-part owners and the master, or only against the surviving co-part owners and the master. By the cases of *Wathan* vs *Oldham*, (9 *Dana*, 50; and *Strader* vs *Fore*, (2 *B. Monroe*, 123,) the removal of the boat authorizes a joint decree against the master who was on board when the slave was carried away, and against the owners also, although they were not on board, and had no personal agency in the asportation of the slave. But inasmuch as the wrong complained of is a tort, sounding in damages, and not like to trover and conversion, as would seem from the construction given to the statutes of 1824 and 1828, by the Court of Appeals in *Church* vs *Chambers*, (3 *Dana*. 274;) and *Wathan* vs *Oldham's heirs*, (9 *Dana;* 51,) and as the statutes in providing this remedy have not given it against executors and administrators, I

shall in this case decree only against the master and surviving owners. (Without meaning to decide that a decree may not under circumstances apt and proper, go against executors and administrators. If an executor or administrator had title, as such, in the boat when the tort was committed, then undoubtedly, he would as owner or co-part owner, be responsible by a proper proceeding against the boat, master and owners.)

The defendants, J. R. McFarland and Kirkpatrick, having departed this life; ordered and decreed, that the surviving defendants, Munroe Quarrier, William Christopher, Jacob Renear and Jacob Darneal pay to the plaintiff, Virgil McKnight, four hundred dollars, the damages by the jurors in their verdict assessed, and also the costs by the plaintiff in this behalf expended, to be taxed by the Clerk.

*Pirtle and Duncan* for plaintiffs: *Guthrie and Bullock* for defendant.