## INDIANA *v.* KENTUCKY.

ORIGINAL.

No. 2. Original. Argued April 9, 10, 1890. — Decided May 19, 1890.

The waters of the Ohio River, when Kentucky became a State, flowed in a channel north of the tract known as Green River Island, and the jurisdiction of Kentucky at that time extended, and ever since has extended, to what was then low-water mark on the north side of that channel, and the boundary between Kentucky and Indiana must run on that line, as nearly as it can now be ascertained, after the channel has been filled.

The dominion and jurisdiction of a State, bounded by a river, continue as they existed at the time when it was admitted into the Union, unaffected by the action of the forces of nature upon the course of the river.

Long acquiescence by one State in the possession of territory by another State, and in the exercise of sovereignty and dominion over it, is conclusive of the title and rightful authority of the latter State.

In EQUITY, to settle and determine the boundary line between the States of Indiana and Kentucky.

On the 20th day of December, 1783, the legislature of Virginia by statute authorized and empowered the delegates of the State in the Congress of the United States "for and on behalf of this State, by proper deeds or instrument in writing, under their hands and seals, to convey, transfer, assign and make over unto the United States, in Congress assembled, for the benefit of the said States, all right, title and claim, as well of soil as jurisdiction, which this Commonwealth hath to the territory or tract of country within the limits of the Virginia charter, situate, lying and being to the northwest of the river Ohio."

On the 1st of March, 1784, the delegates from that State in Congress executed and delivered to "the United States in Congress assembled" a deed of "all right, title and claim, as well of soil as of jurisdiction, which the said Commonwealth hath to the territory or tract of country within the limits of the Virginia charter, situate, lying and being to the northwest of the river Ohio." This deed was, on the same day, accepted by Congress, and was spread at length upon its records.

On the 13th of July, 1787, Congress enacted an ordinance which was entitled "*An ordinance for the government of the territory of the United States northwest of the river Ohio.*" There were no words of description in this ordinance except those contained in its title.

In 1788 the legislature of Virginia, by an act which recited the passage of this ordinance, enacted : " that the afore-recited article of compact between the original States and the people and States in the territory northwest of Ohio river be, and the same is hereby, ratified and confirmed, anything to the contrary in the deed of cession of the said territory by this Commonwealth to the United States notwithstanding."

The first Congress assembled under the Constitution enacted, on the 7th August, 1789, "*An act to provide for the government of the territory northwest of the river Ohio.*" These words of description were repeated in the act; but there were no other words of description.  1 Stat. 50.

On the 18th December, 1789, the legislature of Virginia passed an act consenting " that the district of Kentucky, within the jurisdiction of said Commonwealth, and according to its actual boundaries at that time, should be formed into a new State."  By that act it was further provided that " the use and navigation of the river Ohio, so far as the territory of the proposed State, or the territory which shall remain within the limits of this Commonwealth, lies therein, shall be free and common to the citizens of the United States ; and the respective jurisdictions of this Commonwealth and of the proposed State, on the river aforesaid, shall be concurrent only with the States which shall possess the opposite shores of the said river."

On the 26th May, 1790, Congress established a territorial government over " the territory of the United States south of the river Ohio ;" 1 Stat. 123 ; but on the 4th of February, 1791, 1 Stat. 189, it gave its consent to the admission of Kentucky into the Union, " according to its actual boundaries on the 18th day of December, 1789," the date of the passage of the act of the legislature of Virginia.

On the 7th May, 1800, an act was passed " to divide the

territory of the United States northwest of the Ohio into two separate governments." 2 Stat. 58.

On the 30th April, 1802, the enabling act for the admission of Ohio was passed, the Ohio River being made the southern boundary. 2 Stat. 173. By this act everything west of the present boundary of Ohio, and east of the division line established by the act of 1800 was "made a part of the Indiana Territory."

On the 3d February, 1809, the Territory of Illinois was separated from the Territory of Indiana, the Wabash River being the boundary. 2 Stat. 514. And, on the 19th April, 1816, the enabling act for Indiana was passed, in which it was enacted that the State should be bounded "on the south by the river Ohio, from the mouth of the Great Miami River to the mouth of the river Wabash." 3 Stat. 289.

The controversy in this case related to the jurisdiction over the Green River Island, a formation in the river on the Indiana side opposite the mouth of the Green River, entering the Ohio from Kentucky; and the claims of Indiana in respect to it are fully stated in the brief and argument of its counsel. Some of the main issues were issues of fact, concerning which there was a large amount of proof. No good purpose can be served by further reference to it.

An act passed by the legislature of Kentucky in 1873, and an Indiana statute following it in 1875 and the proceedings under the latter were relied upon by the State of Kentucky. These acts are printed in the margin.[1]

---

[1] "AN ACT to fix and determine the boundary line between the States of Indiana and Kentucky above and near Evansville.

"WHEREAS, Difficulty has arisen between the owners of land in Indiana and Kentucky in regard to the boundary line between said States, and [said] difficulty involves the title to large tracts of land at or near the line between Green River Island and the State of Indiana; therefore,

"*Be it enacted by the General Assembly of the Commonwealth of Kentucky,*

"§ 1. That the Governor of the State be, and is hereby empowered and directed, to select a commissioner, who shall, be a resident of Kentucky, and a practical surveyor, who shall act with a similar person selected by the Governor of the State of Indiana, and such persons so selected shall make a survey of the line dividing said States, beginning at the head of the

*Mr. Alpheus E. Snow* and *Mr. Joseph E. McDonald* (with whom was *Mr. John M. Butler* on the brief) for the State of Indiana.

island known as Green River Island opposite, or nearly so, from the mouth of Green River; running thence in a direction down the Ohio River to the lower end of said island, upon a line dividing said island and the State of Kentucky from the State of Indiana. Said commissioners shall consult the surveys originally made by the United States government, if there be more than one, and they be not inconsistent with each other, and said commissioners shall be governed in running said line by such survey or surveys made by the government of the United States. Within ten days after such survey, said commissioners shall reduce said survey to writing, causing the metes and bounds and land-marks to be particularly described, and sign the same, and acknowledge the same before any officer authorized to take acknowledgments of deeds, and duplicates of such written statements of survey, signed and acknowledged by the commissioners, shall be filed in the office of the clerk of the Henderson County Court, and in the auditor's office of Vanderburgh, and Warrick counties, Indiana; and such written statement, or a copy duly certified by the clerk of the said Henderson County Court, shall be conclusive evidence of the said line dividing said island, so called, from said State of Indiana, in any of the courts of this State.

"§ 2. The commissioners to be appointed under this act shall report to the Governor, in writing, the result of the survey together with a plat of the same; and when said survey shall have been completed, the commissioner shall file his account with the Governor, and when the same shall be examined and approved by him, the Auditor of Public Accounts is hereby authorized to draw his warrant on the Treasury for said amount in favor of the commissioner appointed: *Provided, however*, said amount shall not exceed the sum of two hundred and fifty dollars.

"§ 3. This act shall take effect and be in force from its passage. Approved April 21, 1873." 1 Sess. Laws 1873, 51, c. 964.

The statute of the State of Indiana of February 27, 1875, referred to in the cross-bill was as follows:

"AN ACT to ascertain the location of the boundary line between the State of Indiana and Kentucky, above and near Evansville, and making the same evidence in any dispute, and declaring an emergency. (Approved February 27, 1875.)

"WHEREAS, Difficulty and dispute have arisen between the owners of land in Indiana and Kentucky, in regard to the boundary line between said States, and said difficulty involves the title to large tracts of land above, near the line between the Green River Island and the State of Indiana:

"SECTION 1. *Be it enacted by the General Assembly of the State of Indiana*, that the Governor be and is hereby empowered and directed to select a commissioner, who shall be a resident of the State of Indiana and a prac-

From a point on the northwest side of the Ohio River, about six miles above the city of Evansville, Indiana, to a point on the same side of the river about one-half mile above that city, the Ohio River curves toward Kentucky. Between these same points a depression or bayou exists which lies on nearly a straight line from one point to the other. The bottom of this depression is at present from twenty to thirty feet above low-water mark of the Ohio River.

There are some evidences that near the upper point, this depression, at some past period, divided into two at the river's

---

tical surveyor, who shall act with a similar commissioner to be appointed by the Governor of the State of Kentucky, and the two commissioners so selected, shall make a survey of the line dividing said States, beginning at the head of said Green River Island, near and opposite to the mouth of Green River, and running thence down the Ohio River to the lower end of said island.

"Sec. 2. In running said line the said commissioners shall consult and be governed by the surveys originally made by the government of the United States, when such surveys are not inconsistent with each other, and they shall establish and mark proper monuments along said line, whereby the same may be plainly indicated and perpetuated.

"Sec. 3. Within ten days after making such survey and establishing said line, said commissioners shall reduce the same to writing, giving a full and plain description of all the courses and distances, and of the marks and monuments made and established, and sign and acknowledge the same before some officer authorized to take acknowledgments of deeds, which writing, so acknowledged, shall be recorded in the Recorder's office in the counties of Vanderburgh and Warrick, and the original filed in the office of the Secretary of State, and such writing, or the record thereof, shall be conclusive evidence in any of the courts of this State of the boundary line between the State of Indiana and Kentucky, between the points on said Green River Island heretofore indicated.

"Sec. 4. There is hereby appropriated out of the moneys of the State, in the hands of the Treasurer, a sum not exceeding two hundred and fifty dollars, to pay for making said survey. After rendering the services provided for in this act, the commissioners shall make proof to the judge of the Circuit Court of Vanderburgh County of the value thereof, to which the said judge shall certify, and upon the presentation of such certificate, the Auditor of the State shall draw his warrant in favor of said commissioner for amount so certified not exceeding the said sum of two hundred and fifty dollars.

"Sec. 5. Whereas, An emergency exists for the immediate taking effect of this act, the same shall be in force from and after its passage."

edge, thus leaving a delta between the two depressions. Opposite the upper point, on the south (Kentucky) side of the Ohio River, the Green River flows into the Ohio.

The land lying between the depression and the Ohio River consists of two connected tracts, one called the " Green River Island " and the other the " Green River Island Tow-head," — the latter being a tract formed by deposit which has within the last twenty or thirty years become attached to the " Green River Island " tract at all stages of water.

The land lying in the delta of the depression northeast of the " Green River Island " tract is called " Buck Island." The depression or bayou above referred to is called the " Green River Island Bayou."

Until the year 1875, it was generally supposed, in the vicinage, that the boundary line between the two States was the low-water mark of the Ohio River on its northwest side, but it was claimed by persons who purported to assert the claims of the State of Kentucky that the low-water mark of the Ohio River on the northwest side was the middle line of the " Green River Island Bayou," and of its northern branch at the point where the bayou divided, and that hence such middle line of the bayou was the boundary line between the two States.

A few persons who claimed under the State of Kentucky, and whose title deeds bounded their land at the state boundary line, claimed that the meander line of the United States survey of 1806, which ran along the top of the north (Indiana) bank of the " Green River Island Bayou," and upon the north (Indiana) bank of the north branch of the bayou where it divided, was the state boundary line.

In the year 1875 a survey was made for the purpose of locating the state boundary line between the two points, above referred to, by commissioners of the two States, under peculiar circumstances hereafter to be discussed. This survey located the state boundary line upon the meander line of the United States survey of 1806.

The " Green River Island " tract is about five and one-half miles long, and a little over a mile wide at its greatest width,

Argument for the State of Indiana.

MAP

Showing the portion of the Boundary Line in Dispute between the States of Indiana and Kentucky and the Region adjacent thereto.

Line of Survey of 1875, relocating Meander Line of U. S. Survey of 1806. Boundary as claimed by Kentucky

Line of low water mark, northwest side of the Ohio River, (1888)

KENTUCKY.

and tapers to a point at both ends. It contains nearly two thousand acres of land. The "Green River Island Towhead" contains about one hundred acres: The "Buck Island" tract contains about fourteen acres. The narrow strip of land between the bayou and the line of the survey of 1875 contains about one hundred acres. The land is worth on the average fifty dollars an acre.

The owners of the land on the "Green River Island" tract deriving title from Virginia and Kentucky had, prior to 1875, been in dispute and conflict with the owners of the adjacent land in Indiana, deriving title from the United States, over the ownership of "Buck Island." After the survey of 1875, the trouble was much increased, on account of the doubtful state in which the title to the strip between the bayou and the line of the survey of 1875 was left.

Inasmuch as these disputes and conflicts had their origin in a dispute as to the state boundary, the State of Indiana, after having attempted to settle the boundary line by agreement with the State of Kentucky and failed, brought this suit for the purpose of obtaining a final settlement of all disputes by having the location of the state boundary line between the two points above referred to authoritatively settled.

I. Do the words "Lying and being to the northwest of the river Ohio" in the act of cession of 1783 from Virginia to the United States, and the words "on the south by the Ohio River" in the act of Congress of 1816 providing for the formation of the State of Indiana, fix the southern boundary at the middle line of the Ohio River, or on the north or the south side of the Ohio River? and if on either the north or south side of the Ohio River, at the line of high-water mark, medium water mark or low-water mark?

In the year 1820, the case of *Handly's Lessee* v. *Anthony*, 5 Wheat. 374, was brought in this court from the Circuit Court of the United States for the District of Kentucky. That case was an action of ejectment, in which the plaintiff claimed under a grant from the State of Kentucky and the defendants under a grant from the United States. The title

of the individuals who were parties in that action depended, as Chief Justice Marshall, who delivered the opinion of the court, states, "upon the question whether the lands lie in the State of Kentucky or in the State of Indiana." The land in question in that case was land lying north of the main Ohio River, and between the main river and a bayou which was dry during a portion of the year.

The question involved in that case, so far as the boundary line between the States was concerned, was whether the boundary line between the States was or was not at the medium water mark on the northwest side of the Ohio River. There was no claim that the boundary line was north of the medium water mark on the northwest side, and consequently it was entirely immaterial whether the boundary line went to low-water mark on the northwest side or to the middle line of the river, or to low-water mark on the southeast side. If the boundary line was south of the medium water mark on the northwest side, the land was necessarily in Indiana, whether the boundary line was at low-water mark on either side or at the middle line of the Ohio River.

The court however in that case entered into an inquiry as to the construction of the act and deed of cession of the Northwest Territory and arrived at the conclusion that the boundary between the States was the low-water mark on the northwest side of the Ohio River. The argument of Chief Justice Marshall is shown by the following quotations :

"  . . . It is not the bank of the river, but the river itself at which the cession of Virginia commences. She conveys to Congress all her right to the territory 'situate, lying and being to the northwest of the river Ohio.' And this territory, according to express stipulation, is to be laid off into independent States. These States, then, are to have the river itself, wherever that may be, for their boundary. This is a natural boundary, and, in establishing it, Virginia must have had in view the convenience of the future population of the country.

"When a great river is the boundary between two nations or States, if the original property is in neither, and there be

no convention respecting it, each holds to the middle of the stream. But when, as in this case, one State is the original proprietor, and grants the territory on one side only, it retains the river within its own domains, and the newly created State extends to the river only. The river, however, is its boundary."

"If instead of an annual and somewhat irregular rising and falling of the river, it was a daily and almost regular ebbing and flowing of the tide, it would not be doubted that a country bounded by the river would extend to low-water mark. This rule has been established by the common consent of mankind. It is founded on common convenience. Even when a State retains its dominion over a river which constitutes the boundary between itself and another State, it would be extremely inconvenient to extend its dominion over the land on the other side which was left bare by the receding of the water. And this inconvenience is not less where the rising and falling is annual than where it is diurnal. Wherever the river is a boundary between States, it is the main, the permanent river, which constitutes that boundary; and the mind will find itself embarrassed with insurmountable difficulty in attempting to draw any other line than the low-water mark.

"When the State of Virginia made the Ohio the boundary of States, she must have intended the great river Ohio, and not a narrow bayou into which its waters occasionally run. All the inconvenience which would result from attaching a narrow strip of country lying on the northwest side of that noble river to the States on its southeastern side, would result from attaching to Kentucky, the State on its southeastern border, a body of land lying northwest of the real river, and divided from the main land only by a narrow channel, through the whole of which the waters of the river do not pass, until they rise ten feet above low-water mark.

"The case is certainly not without its difficulties; but in the great questions, which concern the boundaries of States, where great natural boundaries are established in general terms, with a view to public convenience and the avoidance of controversy, we think the great object, when it can be distinctly perceived, ought not to be defeated by those technical

perplexities which may sometimes influence contracts between individuals. The State of Virginia intended to make the great river Ohio, throughout its extent, the boundary between the territory ceded to the United States and herself. When that part of Virginia, which is now Kentucky, became a separate State, the river was the boundary between the new States, erected by Congress in the ceded territory, and Kentucky. Those principles and considerations which produced the boun-. dary ought to preserve it. They seem to us to require that Kentucky should not pass the main river and possess herself of lands lying on the opposite side, although they should, for a considerable portion of the year, be surrounded by the waters of the river flowing into a narrow channel."

From what has been said above, it is evident that the conclusion of this court, in the case of *Handly's Lessee* v. *Anthony*, above referred to, relating to the state boundary line, is a *dictum*, and that it is, therefore, open to this court to decide whether the boundary line between these States extends along the middle line of the Ohio River or along the line of high-water mark, medium water mark or low-water mark on the northwestern side or the southeastern side.

There have been few cases in the state courts in which the exact location of the boundary of the States northwest and southeast of the Ohio River has been a material question.

The question has been considered in the state courts, and the following may be said to be the result of the decisions.

The Kentucky courts have always claimed, under the authority of *Handly's Lessee* v. *Anthony*, to the low-water mark on the northwest side of the Ohio River. *Fleming* v. *Kenney*, 4 J. J. Marsh. 155; *Church* v. *Chambers*, 3 Dana, 274; *McFall* v. *Commonwealth*, 2 Met. (Ky.) 394; *McFarland* v. *Knight*, 6 B. Mon. 500.

In Indiana the authority of *Handly's Lessee* v. *Anthony* is recognized as applicable to the boundaries of riparian owners, but the right of wharfing out into the Ohio River is insisted upon. *Stinson* v. *Butler*, 4 Blackford, 285; *Cowden* v. *Kerr*, 6 Blackford, 280; *Doe* v. *Hildreth*, 2 Indiana, 274; *Commissioners of St. Joseph County* v. *Pidge*, 5 Indiana, 13;

*Bainbridge* v. *Sherlock*, 29 Indiana, 364; *S. C.* 95 Am. Dec. 644; *Gentile* v. *State*, 29 Indiana, 409; *Carlisle* v. *State*, 32 Indiana, 55; *Martin* v. *Evansville*, 32 Indiana, 85; *Sherlock* v. *Bainbridge*, 41 Indiana, 35; *Sherlock* v. *Alling*, 44 Indiana, 184.

The same may be said of the courts of Illinois, though there is a strong tendency to claim to the middle of all rivers. *Middleton* v. *Pritchard*, 3 Scammon, 510; *S. C.* 38 Am. Dec. 112; *Ensminger* v. *People*, 47 Illinois, 384; *S. C.* 95 Am. Dec. 495; *Buttenuth* v. *St. Louis Bridge Co.*, 123 Illinois, 535; *Fuller* v. *Dauphin*, 124 Illinois, 542.

In Ohio and Virginia the question has been hotly discussed, and the authority of *Handly's Lessee* v. *Anthony* denied.

Virginia was dissatisfied with the case of *Handly's Lessee* v. *Anthony* because she claimed to high-water mark on the north-west side of the river; Ohio, because she claimed to the middle of the river. See *Commonwealth* v. *Garner*, 3 Grattan, 655; *Benner's Lessee* v. *Platter*, 6 Ohio, 505; *Covington & Cincinnati Bridge Co.* v. *Mayer*, 31 Ohio St. 317; *St. Joseph &c. Railroad* v. *Devereaux*, 41 Fed. Rep. 14.

The conclusion of Chief Justice Marshall is based upon the theory that the act and deed of cession of Virginia are to be treated as a grant of the undisputed territory of Virginia, and that the words "to the northwest of the river Ohio," are to be construed as though they were words of strict boundary rather than of governmental description. He admits that his construction is not without difficulty, and the words are plainly ambiguous.

An examination of the circumstances under which the cession was made establishes that:

1. The words "to the northwest of the river Ohio" in the act and deed of cession of Virginia are not words of boundary, since the territory had not at that time any determinate bounds on the north.

2. These words were used in the previous statutes of Virginia, and in the common and official speech and writing of the time to describe a large tract of territory claimed by England, France, Spain, the United States and Virginia.

3. The act of cession of 1783 is remodelled from the act of 1781, in which the territory of Virginia is divided into two

parts by such description that, if the words of description are construed technically, the Ohio River itself is not described.

4. The act of 1783 is not strictly an act of cession, but a proposition for compromise between Virginia and the United States of a dispute in which the United States claimed that Virginia had no title to the territory southeast or northwest of the Ohio River.

For these reasons it is evident that the words "within the limits of the Virginia Charter to the northwest of the river Ohio" in the act of Virginia of 1783 are words of governmental description of an indeterminate tract, contained in an agreement of compromise, and not words of definite boundary contained in an instrument of grant.

It is therefore improper to treat the act and deed of cession of Virginia as though they were a carefully drawn deed of grant by metes and bounds, and to give to the words "to the northwest of the river Ohio" the same technical significance which they might have if they constituted a part of a carefully drawn description by metes and bounds of a territory admitted to be the undisputed property of the grantor.

By the insertion of the provision respecting the free navigation of the Ohio River, Virginia accomplished three important things.

1. It bound the State of Kentucky to apply to the Ohio River the principles relating to the navigable waters wholly within the Northwest Territory, regarding which it was by the ordinance provided that: "The navigable waters leading into the Mississippi and St. Lawrence, and the carrying places between the same, shall be common highways and forever free, as well to the inhabitants of the said territory, as to the citizens of the United States, and those of any other States that may be admitted into the Confederacy, without any tax, impost, or duty therefor."

2. It compelled Kentucky to agree with the United States that it would never attempt to control the navigation of the Ohio River. If Kentucky had gone over to Spain, the first act, of course, would have been to close the Ohio and Mississippi rivers to navigation. By keeping Kentucky in the Union

and binding her to exercise only that concurrent jurisdiction which States bounded by navigable rivers would be entitled to exercise by the rules of international law, the possibility of either the Ohio or the Mississippi rivers being closed to navigation would be done away with, since Spain, without Kentucky and the southwest territory, east of the Mississippi, would not have been strong enough to have violated the obligations of the treaty of 1783, which provided for the free navigation of the Mississippi.

3. It bound itself and Kentucky to recognize as having concurrent jurisdiction with itself over the Ohio River " only the States which may possess the opposite shores of said river," that is, the United States and the States to be formed in the Northwest Territory, bounding on the Ohio River. Thus, all complications with the Ohio Company, or any other land company, would be avoided, since the United States, by consenting to the act, would bind themselves to protect Virginia and Kentucky from any such claims of jurisdiction over the Ohio River by any land company.

In this act Virginia treats itself and Kentucky as bounding *on* the Ohio River. The words are: " That the use and navigation of the river Ohio, so far as the territory of the proposed State or the territory which shall remain within the limits of this Commonwealth *lies thereon,*" etc.

Further, this act is an admission by Virginia that the State or States possessing the opposite shores of the river, which at that time was the United States, had a right to exercise concurrent jurisdiction over the Ohio River with itself and Kentucky, since it does not purport to grant to the United States any new rights.

Probably nothing was further from the intention of the Virginia legislature in adopting the act of cession of 1783 than to make claim to exclusive territorial rights over the Ohio River, as against the United States. The advantages of the Union were at that time fully recognized, and the immense value of the water-ways to the civilization of that period made it the one idea of the State to keep the great water-ways open to free navigation, the States on both sides possessing jurisdic-

tion over the river for the proper preservation of peace and order thereon.

Unless the terms of written instruments make it absolutely clear that it was the intention that the boundary line between the States on the opposite sides of the river should be elsewhere than at the middle line, that line should be the boundary.

As above shown, the words of the act of cession of the Northwest Territory do not necessarily fix the boundary line elsewhere than at the middle line of the Ohio River.

It is therefore submitted that the middle line of the Ohio River is the boundary line between the States of Indiana and Kentucky.

II. If it be granted that the southern boundary of the State of Indiana is the low-water mark of the Ohio River upon the northwest side, then is that low-water mark of the Ohio River on the northwest side, at the present time, on the north or the south margin of the "Green River Island" tract and the "Buck Island" tract? Does the present location of this low-water mark fix the state boundary line?

The testimony introduced by the State of Indiana proves conclusively that the low-water mark on the northwest side of the Ohio River is, at the present time, south of the "Green River Island Tow-head," and that the whole tract is an accretion to the "Green River Island" tract within the last twenty or thirty years.

III. If it be granted that the low-water mark on the northwest side of the Ohio River is, at the present time, along the southern margin of the "Green River Island" tract, and the "Buck Island" tract; and that the location of this low-water mark at the present time does not fix the state boundary, is it necessary to examine into the facts relating to the location of the low-water mark prior to the year 1816, when the State of Indiana was formed with the Ohio River as its boundary on the south, or does the formation of the State of Indiana, in 1816, with that boundary, so fix the boundary, as against the State of Kentucky, as to make evidence as to the location of the low-water mark prior to that date, immaterial?

It is submitted on the proof that, even if it is necessary for the State of Indiana in this case to make proof of the location of the low-water mark on the northwest side of the Ohio River prior to the present time, it is not necessary that it should in its proof go further back than the year 1816; since in that year the State of Kentucky recognized the right of the United States and of the State of Indiana to exercise jurisdiction at least to the low-water mark of the Ohio River on the northwest side.

IV. If the location of the state boundary line was definitely fixed in the year 1816 at the low-water mark of the Ohio River, was the low-water mark on the northwest side of the Ohio River, in 1816, on the north or south margin of the " Green River Island " tract and the " Buck Island " tract, and has it ever since remained as located in 1816 ?

It is shown by the testimony of living witnesses, practically without contradiction, that, since 1820, the depression north of the " Green River Island " tract has remained substantially as it is at present, the height of the bottom of the depression above low-water mark changing slightly from year to year by the washing and filling caused by the high water at seasons of overflow, but the average height above low-water mark remaining substantially the same.

It is submitted, therefore, that, if the low-water mark on the northwest side of the Ohio River is the state boundary, the State of Indiana has shown, by living witnesses, that this line of low-water mark, since 1820, has been on the south margin of both the " Green River Island " tract and the " Buck Island " tract. The testimony referred to under the sixth point of this brief shows that the same state of facts existed between 1820 and 1816.

V. If it be necessary for the purpose of determining the state boundary to examine into the location of the low-water mark on the northwest side of the Ohio River as it existed prior to 1816, did the United States survey of 1806, a meander line of which ran along the north side of the " Green River Island " tract and the " Buck Island " tract, affect the location of the state boundary line ?

Considering the uncertain state of the law, at the time of the United States survey of 1806, with regard to the meaning of the words "to the northwest of the river Ohio;" considering also the fact that there was an outstanding Virginia patent on a part of the "Green River Island" tract (the validity of which will be considered later); considering also that the Henderson County Court of Kentucky had taken upon itself to allow surveys to be made on the "Green River Island" tract by Kentucky surveyors, thus incidentally determining that the "Green River Island" tract was not "to the northwest of the river Ohio;" considering also that, for the United States surveyor to have surveyed the "Green River Island" tract at that time would have required of him the determination of a great question which is yet undetermined; considering also that the surveyor of the United States, in going on the "Green River Island" tract to make surveys over the Kentucky surveys would have doubtless exposed himself to personal violence and ejection from the land, it is not to be wondered that he accepted the interpretation of the words, "to the northwest of the river Ohio," placed upon them by the Kentucky courts, and made return that, in his individual opinion, the bank of the bayou was the bank of the Ohio, and that his superiors did not question his survey.

It is submitted, therefore, that the above considerations greatly weaken, if they do not totally destroy any evidential force that the United States survey of 1806 may be claimed to have, as bearing upon the question of the location of the low-water mark, in 1806, with relation to the "Green River Island" tract.

As evidence in itself of the boundary between the States, it is absolutely worthless, since meander lines are not intended to show the low-water mark, but only to approximately determine the location of the banks of the stream meandered. *Railroad Co.* v. *Schurmeir*, 7 Wall. 272.

VI. If the state boundary line was not definitely fixed at the low-water mark on the northwest side of the Ohio River, in 1816, but was so fixed by the deed of cession from Virginia to the United States in 1784, and by the act of cession of Vir-

ginia in 1783, was the low-water mark on the northwest side
of the Ohio River, in 1783 and 1784, on the north or the south
margin of the " Green River Island " tract and the. " Buck
Island " tract, and has it ever since remained as it existed in
1783 and 1784?

Counsel discussed the evidence on this point at length, and
concluded: Everything, therefore, — science, tradition and
evidence of deceased and living persons, — points to the con-
clusion that the low-water mark on the northwest side of the
Ohio River, is, and since 1783, has been along the. south
margin of the "·Green River Island " and the " Buck Island "
tracts. And hence the conclusion is irresistible that if the low-
water mark on the northwest side of the Ohio River be the
state boundary, therefore the state boundary runs to the south
of all the disputed. tracts, leaving all these tracts within the
jurisdiction of the State of Indiana.

VII. If· it be granted that the southern boundary of the
State of Indiana is the low-water mark on the northwest side
of the Ohio River, and that the low-water mark on the north-
west side of the Ohio River at the present time is on the south-
ern margin of the " Green River Island " tract and the " Buck
Island " tract; but since the year 1816 or the year 1783, the
low-water mark has been along the north margin of those
tracts ; has the process by which the location of the low-water
mark has changed been gradual or sudden, and has such change
been a change to a new condition or a return to an old condi-
tion? If it should be found that the location of the low-water
mark has changed, has the state boundary line changed its
location in consequence of such a change of location of the low-
water mark?

While the principle of accretion is perhaps not strictly appli-
cable to a case of this kind, since there is no claim that the
".Green River Island " tract is a piece of land actually formed
by process of deposit within the *existing* banks of the Ohio
River, yet, taking into consideration that the tract is a forma-
tion by the deposit ·of the Ohio River within its *geological*
banks: that the location of the main river channel of the
Ohio River has been within the recent historical and geologi-

càl times south of the " Green River Island " tract where it now is; that if the " Green River Island " tract was ever a true island it was such from a temporary detachment from the territory of Indiana, it is right and proper that this court in deciding a question of this kind, which is more properly a question of politics and diplomacy than a question of strict law, should base its decision upon the principles of justice, rather than upon strict and technical rules of law, and should dissolve any doubts which may arise as to the existence or non-existence of claimed facts, which by reason of the unsettled condition of the country cannot be proved with absolute accuracy, by calling to its assistance the principle of accretion, and if it should be of opinion that the low-water mark on the northwest side of the Ohio River is the boundary between the States of Indiana and Kentucky, should adjudge that the boundary of the State of Indiana, to which the disputed tracts are now finally and completely attached, is along the southern margin.

VIII. If this court should find that the state boundary line is along the north margin of the " Green River Island " tract, does it also extend along the north or the south margin of the " Buck Island " tract by reason of the fact that the " Buck Island " tract, is an accretion to or a part of the " Green River Island " tract, or an accretion to or a part of the undisputed soil of Indiana ?

It will be noticed that, in the above, two facts are assumed : (1) That the low-water mark on the northwest side of the Ohio River is the state boundary line. (2) That the low-water mark of the Ohio River is on the north margin of the " Green River Island " tract.

Both these facts the State of Indiana expressly denies. If, however, the facts thus assumed to exist were true, the testimony shows that the " Buck Island " tract is an accretion to the undisputed soil of Indiana, and that hence the state boundary line is upon its south margin.

IX. The State of Kentucky has not exercised sovereignty and jurisdiction over the " Green River Island " tract or the " Buck Island " tract in such a manner as to affect the location of the state boundary line.

The "full possession, jurisdiction and control" which the State of Virginia is alleged to have retained after the cession of 1783, is not shown by the evidence.

The cross-bill of Kentucky places her claim of exercise of jurisdiction over the "Green River Island" tract as distinct from the exercise of jurisdiction by Virginia, over the "Green River Island" tract upon four grounds.

The first ground is, "That the owners of soil thereon, hold their title thereto under grants made by her as the original proprietor thereof."

The State of Kentucky was formed June 1st, 1792. It issued its first patent for land on the "Green River Island" tract in 1818. Twenty-six years elapsed, therefore, before the executive officers of the State of Kentucky determined to issue patents for the land on the "Green River Island" tract. Yet it appears from the statement of Zadok Cramer, the author of "The Navigator," published in 1808, that at the time of publishing that book, there were "six or eight families settled" on the "Green River Island" tract.

All the circumstances surrounding the original issue of the Kentucky patents, are consistent with the theory that doubts existed for twenty-six years on the part of the governors of Kentucky as to their right to issue patents for land on the "Green River Island" tract, and that the doubt was finally solved by an acting governor, who was, perhaps, interested in having the question settled one way or the other. A precedent having been once established, the subsequent governors followed it, as was natural and perhaps proper, since the issuing of the first patent determined the position of Kentucky in the matter, and it was as proper to cover the whole tract with patents as to cover any part of it.

Considering the fact that, for twenty-six years, under a system of land laws which permitted the location of land wheresoever the claimant might see fit, no individual took out a patent from Kentucky upon the "Green River Island" tract though during that period there were from six to ten families settled upon it; considering, also, that the facts surrounding the issue of the first patent gave rise to the suspicion that the

state officers issuing the patent may have had an interest in it; considering, also, the great looseness with which the patents were finally issued; considering, also, that it was for the pecuniary interest of the settlers on the island to take title from Kentucky rather than from the United States, and that they could not have obtained title from the United States without having the United States survey of 1806 corrected, it is submitted that the facts surrounding the issue of the Kentucky patents are such as to destroy the force of the issue of those patents as proof of the exercise of jurisdiction by Kentucky over the " Green River Island " tract.

The second claim of Kentucky of right to exercise jurisdiction over the " Green River Island " tract is, "that the property thereon, amounting to many thousands of dollars in value, has always been assessed for taxation by her legally authorized officials, and the taxes thereon paid into her state treasury." This statement is not supported by the evidence.

The third ground on which the State of Kentucky claims to have acquired the right of jurisdiction over the " Green River Island " tract is, "that the residents thereon, possessing the other necessary qualifications, have always voted at her elections as legal voters." It appears that the residents on the " Green River Island " tract voted, when they voted at all, at the town of Henderson, some twenty miles away by the river. Admitting this to be true, it is of little or no effect as showing an exercise of jurisdiction by the State of Kentucky over the disputed tracts.

The fourth ground on which the State of Kentucky claims to have acquired the right of jurisdiction over the " Green River Island " tract is, "that her courts have always exercised undisputed jurisdiction, both civil and criminal, over the said island."

The record in the case of *Garrett* v. *McClain* shows that the jurisdiction of the Kentucky court was disputed in that very case. One of the grounds on which the injunction against the execution of the judgment was asked was, that the Kentucky court which rendered the judgment had no jurisdiction over the " Green River Island " tract, because that tract was " beyond the territorial limits of the State of Kentucky."

X. The State of Kentucky, in her cross-bill, claims that the State of Indiana has always acquiesced in the claims of Kentucky to the "Green River Island" tract. The State of Indiana did not acquiesce in the original issuing of the Virginia patent, since the State of Indiana did not exist at the time the Virginia patent was issued.

It is impossible for a State of this Union to acquire a right of jurisdiction as against another State, over a disputed territory, by any exercise of jurisdiction, however clear and however long continued. To permit a State to acquire jurisdiction by its own action as against another State, would be to apply the equitable doctrine of laches to dealings between sovereign States. Such a doctrine never has been and never could be admitted to exist by the States of this Union. It would be in violation of the common law maxim, — *nullum tempus occurrit regi.*

While a State may allow rights to be acquired against it by its own citizens if it so chooses, it is inconsistent with the idea of sovereignty that one State or nation should acquire rights of territory and jurisdiction by the inaction of another State. The question of state boundaries is a question to be determined by the construction of written instruments, and the examination of the facts in connection therewith, and the application of the principles of law and equity so far as they are consistent with state sovereignty. If it should be admitted that there could be any exercise of jurisdiction or acquisition of territory through the action of one State, and the inaction of another, the result of the doctrine would be to produce disputes regarding the territory, which could finally be settled only by force, since States would not permit the courts to determine claims to acquisition of territory.

Such a doctrine would also be subversive of Article I, section 10, of the Constitution of the United States which provides that; "No State shall, without the consent of Congress, enter into any agreement or compact with another State." If the doctrine of laches or limitation is to apply as between States, it could only be sustained upon the theory upon which the doctrine of laches or limitation is sustained as between

individuals, that is, upon presumption of a prior grant. To hold, therefore, that a State might acquire territory and jurisdiction by its own action, would be practically to hold that one State might enter into compact or agreement with another State, without the consent of Congress, and that the right of jurisdiction which a State of this Union possesses, is a right which may be conveyed by the State without the consent of Congress.

XI. Have the States of Indiana and Kentucky so legislated, and have any acts been done under such legislation which can affect the location of the boundary line between the two States?

The statute of Indiana, of February 27, 1875, referred to in the cross-bill, does not stand by itself. In the year 1873, the State of Kentucky had legislated in regard to the boundary line between the States near the "Green River Island" tract. The statute of Kentucky relating to this matter was approved April 21st, 1873. [This legislation, and the acts of the executive of each State were then reviewed at length, and the results of the examination were claimed to be this:]

The effect of the legislation of Kentucky in 1873, and of Indiana in 1875, since the consent of Congress to it was not obtained, depends, therefore, entirely upon the question whether the meander line of the Ohio River in the United States survey of 1806 was or was not the state boundary line. If it was, it was competent for the two States to provide any evidence of it, as the actual and admitted boundary, which they saw fit.

That the meander line of the United States survey of 1806 was not and could not be the state boundary line is a question which would seem not to admit of argument. When this court held, in the case of *Railroad Company* v. *Schurmeir*, 7 Wall. 272, that the meander lines of the United States surveys were run merely for the purpose of determining the amount of land for which the purchaser from the United States government should pay, it placed a final negative upon any claim that the meander line could ever be a state boundary line. There is not enough in the fact that a meander

line was run along a river forming the boundary of a State of this Union to raise such a meander line from its humble office of determining whether a person should pay a few dollars, more or less, to the dignity of a boundary line between two States.

The absurdity of the survey of 1875 is apparent when it is considered that if the meander line of the United States survey of 1806 should have been adopted as the boundary of Indiana along the Ohio River, a large and valuable part of the city of Evansville and of the other towns and cities of Indiana on the Ohio River would have become a part of the State of Kentucky. If it was proper for the state boundary line to be fixed at the meander line adjacent to the " Green River Island " tract, it was equally proper that it should be so fixed at all points along the Ohio River.

If these statutes of Indiana and Kentucky made or attempted to make the meander line of the United States survey of 1806 the boundary line, they impaired the obligation of the contract made by the United States with the patentees from the United States adjacent to the " Green River Island " tract, on the north, since these statutes made no provision for compensation to these patentees, for the land taken from them between the bayou and the meander line of the survey of 1806.

It is submitted, therefore, — whether the act of Indiana of 1875 is to be treated as part of a proposed " agreement or compact " between the State of Indiana and the State of Kentucky, or whether it stands by itself as furnishing a proposed rule of evidence in the Indiana courts, — that the acts required to be performed as a prerequisite to the taking effect of the statute were never performed and never can be performed; that the statute itself is unconstitutional and void and that therefore neither this statute nor the acts done thereunder have any effect upon the location of the state boundary line.

*Mr. P. W. Hardin,* Attorney General of the State, and *Mr. J. Proctor Knott* for the State of Kentucky.

MR. JUSTICE FIELD delivered the opinion of the court.

This is a controversy between the State of Indiana and the State of Kentucky growing out of their respective claims to the possession of and jurisdiction over a tract of land nearly five miles in length and over half a mile in width, embracing about two thousand acres, lying on what is now the north side of the Ohio River.

Kentucky alleges that when she became a State on the 1st of June, 1792, this tract was an island in the Ohio River, and was thus within her boundaries, which had been prescribed by the act of Virginia creating the District of Kentucky. The territory assigned to her was bounded on the north by the territory ceded by Virginia to the United States. The tract in controversy was then and has ever since been called Green River Island. Kentucky founds her claim to its possession and to jurisdiction over it upon the alleged ground that at that time the river Ohio ran north of it, and her boundaries extended to low-water mark on the north side of the river; also upon her long undisturbed possession of the premises, and the recognition of her rights by the legislation of Indiana.

Indiana rests her claim also upon the boundaries assigned to her when she was admitted into the Union on the 11th of December, 1816, of which the southern line was designated "as the river Ohio from the mouth of the Great Miami River to the mouth of the Wabash." This boundary, as she alleges, embraces the island in question, she contending that the river then ran south of it, and that a mere bayou separated it from the mainland on the north.

The territory lying north and west of the Ohio, embracing the State of Indiana, as well as the territory lying south of that river, embracing the State of Kentucky, was, previous to 1776, and down to the cession of the same to the United States, held by the State of Virginia. Indeed, that Commonwealth claimed that all the territory lying north of the Ohio River and west of the Alleghanies and extending to the Mississippi was within her chartered limits. As stated by Chief Justice Marshall, in *Handly's Lessee v. Anthony*, 5 Wheat.

374, 376, at an early period of the Revolutionary War, "the question whether the immense tracts of unsettled country which lay within the charters of particular States ought to be considered as the property of those States or as an acquisition made by the arms of all for the benefit of all, convulsed our confederacy and threatened its existence." To remove this cause of disturbance, Congress in September, 1780, passed a resolution recommending "to the several States having claims to waste and unappropriated lands in the western country, a liberal cession to the United States of a portion of their respective claims, for the common benefit of the Union." The Commonwealth of Virginia yielded to this recommendation, and on the 20th of December, 1783, an act was passed by her legislature authorizing her delegates in Congress to convey to the United States all her right, title and claim, as well of soil as of jurisdiction, "to the territory or tract of country within the limits of the Virginia charter, situate, lying and being to the northwest of the river Ohio," subject to certain conditions, among which was that the territory should be laid out and formed into States containing a suitable extent of territory, not less than one hundred nor more than one hundred and fifty miles square, or as near thereto as the circumstances would admit, and that the States so formed should be distinct republican States, and admitted members of the Federal Union, having the same rights, sovereignty, freedom and independence as the other States. In pursuance of this act the delegates in Congress, on the 1st of March, 1784, executed a formal deed ceding to the United States all the right, title and claim as well of soil as of jurisdiction which the Commonwealth had to the territory or tract of country within the limits of the Virginia charter, "*situate, lying and being to the northwest of the river Ohio*," for the uses and purposes and subject to the conditions mentioned in the act of the Commonwealth.

By the act of Congress of July 13, 1787, entitled, "An ordinance for the government of the territory of the United States northwest of the river Ohio," a modification was made of the terms of the cession of Virginia, to the effect that there should be formed in the ceded territory not less than three

nor more than five States, the fixed and established boundaries of which were designated, and of which the Ohio River was declared to be one.

As thus seen, the territory ceded by the State of Virginia to the United States, out of which the State of Indiana was formed, lay northwest of the Ohio River. The first inquiry, therefore, is as to what line on the river must be deemed the southern boundary of the territory ceded, or, in other words, how far did the jurisdiction of Kentucky extend on the other side of the river. Early in the history of the State, doubts were raised on this point, and to quiet them, its legislature, on the 27th of January, 1810, passed the following act declaring the boundaries of certain counties in the Commonwealth:

" Whereas doubts· are suggested whether the counties calling for the river Ohio as the boundary line, extend to the state line on the northwest side of said river, or whether the margin of the southeast side is the limit of the counties; to explain which

" *Be it enacted by the General Assembly,* That each county of this Commonwealth, calling for the river Ohio as the boundary line, shall be considered as bounded in that particular by the state line on the northwest side of said river, and the bed of the river and the islands therefore shall be within the respective counties holding the main land opposite thereto, within ·this State, and the several county tribunals shall hold jurisdiction accordingly." 1 Statute Law of Kentucky, (1834,) p. 268 Sess. Laws 1810, 100.

Upon this question of boundary we also have, happily, a decision of this court rendered so early as 1820. In *Handly's Lessee* v. *Anthony,* 5 Wheat. 374, ejectment was brought to recover land which the plaintiff claimed under a grant from the State of Kentucky, while the defendants held under a grant from the United States, and the title depended upon the question whether the land lay in the State of Kentucky or in the State of Indiana. It was separated from the mainland of Indiana by a bayou, a small channel, which made out of the Ohio, and entered that river again a few miles below.

This bayou was from four to five poles wide and its bed was

dry during a portion of the year. The court said that the question whether the land lay within the State of Kentucky or of Indiana depended chiefly upon the land law of Virginia and on the cession of that State to the United States. And in determining this question it went into the consideration of the proper construction to be given to the deed of cession, and reached the conclusion that the boundary between the States was at low-water mark on the northwest side of the river.

"In pursuing this inquiry," said the court, p. 379, "we must recollect, that it is not the bank of the river, but the river itself, at which the cession of Virginia commences. She conveys to Congress all her right to the territory 'situate, lying and being to the northwest of the river Ohio.' And this territory, according to express stipulation, is to be laid off into independent States. These States, then, are to have the river itself, wherever that may be, for their boundary. This is a natural boundary, and in establishing it Virginia must have had in view the convenience of the future population of the country. When a great river is the boundary between two nations or States, if the original property is in neither, and there be no convention respecting it, each holds to the middle of the stream. But when, as in this case, one State is the original proprietor and grants the territory on one side only, it retains the river within its own domain, and the newly created State extends to the river only. The river, however, is its boundary. . . . If, instead of an annual and somewhat irregular rising and falling of the river, it was a daily and almost regular ebbing and flowing of the tide, it would not be doubted that a country bounded by the river would extend to low-water mark. This rule has been established by the common consent of mankind. It is founded on common convenience. Even when a State retains its dominion over a river which constitutes the boundary between itself and another State, it would be extremely inconvenient to extend its dominion over the land on the other side which was left bare by the receding of the water. And this inconvenience is not less where the rising and falling are annual than where they are diurnal. Wherever the river is a boundary between States, it

is the main, the permanent river, which constitutes that boundary ; and the mind will find itself embarrassed with insurmountable difficulty in attempting to draw any other line than the low-water mark. When the State of Virginia made the Ohio the boundary of States, she must have intended the great river Ohio, and not a narrow bayou into which its waters occasionally run. All the inconvenience which would result from attaching a narrow strip of country lying on the northwest side of that noble river to the States on its southeastern side, would result from attaching to Kentucky, the State on its southeastern border, a body of land lying northwest of the real river, and divided from the mainland only by a narrow channel, through the whole of which the waters of the river do not pass until they rise ten feet above the low-water mark."

This decision has been followed by the courts of Kentucky. See *Church* v. *Chambers*, 3 Dana, 279 ; *McFarland* v. *McKnight*, 6 B. Mon. 500, 510 ; *Fleming* v. *Kenny*, 4 J. J. Marsh. 155, 158 ; *McFall* v. *Commonwealth*, 2 Met. (Ky.) 394. In this last case, the defendant, a justice of the peace for a Cincinnati township, in the State of Ohio, solemnized a marriage on a ferry-boat upon the Ohio River, midway between Newport in Kentucky and Cincinnati in Ohio, and was -indicted in the courts of Kentucky for unlawfully solemnizing a marriage, and was convicted of the offence, he not having been authorized to perform that ceremony by the county court of that State. The Court of Appeals of Kentucky in affirming the conviction referred to the authority of *Handly's Lessee* v. *Anthony*, and said : " That the boundary and jurisdiction of the State of Kentucky rightfully extend to low-water mark on the western or northwestern side of the river Ohio must now be considered as settled." The same doctrine was maintained in *Commonwealth* v. *Garner*, 3 Gratt. 655, by the General Court of Virginia, at its June term, 1846, after elaborate consideration, against the earnest contention of some of its judges that the jurisdiction of the State after the cession extended to the line of high-water mark on the northwest side of the river.

We agree with the observations of the court in *Handly's Lessee* v. *Anthony*, that great inconvenience would have fol-

lowed if land on either side of the river, that was separated from the mainland only by a mere bayou, which did not appear to have ever been navigable, and was dry a portion of the year, had been attached to the jurisdiction of the State on the opposite side of the river; and, in the absence of proof that the waters of the river once flowed between the tract in controversy in this case, and the mainland of Indiana, we should feel compelled to hold that it was properly within the jurisdiction of the latter State. But the question here is not, as if the point were raised to-day for the first time, to what State the tract, from its situation, would now be assigned, but whether it was at the time of the cession of the territory to the United States, or more properly when Kentucky became a State, separated from the mainland of Indiana by the waters of the Ohio River. Undoubtedly, in the present condition of the tract, it would be more convenient for the State of Indiana if the main river were held to be the proper boundary between the two States. That, however, is a matter for arrangement and settlement between the States themselves, with the consent of Congress. If when Kentucky became a State on the 1st of June, 1792, the waters of the Ohio River ran between that tract, known as Green River Island, and the main body of the State of Indiana, her right to it follows from the fact that her jurisdiction extended at that time to low-water mark on the northwest side of the river. She succeeded to the ancient right and possession of Virginia, and they could not be affected by any subsequent change of the Ohio River, or by the fact that the channel in which that river once ran is now filled up from a variety of causes, natural and artificial, so that parties can pass on dry land from the tract in controversy to the State of Indiana. Its waters might so depart from its ancient channel as to leave on the opposite side of the river entire counties of Kentucky, and the principle upon which her jurisdiction would then be determined is precisely that which must control in this case. *Missouri* v. *Kentucky*, 11 Wall. 395, 401. Her dominion and jurisdiction continue as they existed at the time she was admitted into the Union, unaffected by the action of the forces of nature upon the course of the river.

The question then becomes one of fact, did the waters of the Ohio pass between Green River Island and the mainland of Indiana when Kentucky became a State and her boundaries were established? There is much evidence introduced on the part of Indiana to show that since her admission into the Union the Ohio River has not passed between the island and the mainland except at intervals of high water; and that at low water the mainland has been accessible for portions at least of the year from the island, free from any water obstructions. Aside from the speculations of geologists, which are not of a very convincing character, the evidence consisted principally of the recollections of witnesses, which were more or less vague and imperfect. Apart from those speculative theories, she produced no evidence that at the time the cession was made by Virginia to the United States in 1784, or when Kentucky became a State, the tract was attached to and formed a part of the territory then ceded, out of which the State of Indiana was created, or that the waters of the Ohio did not run between it and the mainland of Indiana so as to justify its designation as an island in the river. Much evidence has also been given on that subject by Kentucky, and a great number of transactions shown, which proceeded upon the assumption that the tract was within the jurisdiction of that State. It is clear, we think, from the whole testimony, that at an early day after Kentucky became a State, the channel between the island and the mainland of Indiana was often filled with water the whole year and sometimes to the width of two hundred yards; and that water passed through it, of more or less depth, the greater part of the year, until down to a period subsequent to the admission of Indiana into the Union.

But above all the evidence of for  " transactions and of ancient witnesses, and of geological speculations, there are some uncontroverted facts in the case which lead our judgment irresistibly to a conclusion in favor of the claim of Kentucky. It was over seventy years after Indiana became a State before this suit was commenced, and during all this period she never asserted any claim by legal proceedings to

the tract in question.  She states in her bill that all the time since her admission Kentucky has claimed the Green River Island to be within her limits and has asserted and exercised jurisdiction over it, and thus excluded Indiana therefrom, in defiance of her authority and contrary to her rights.  Why then did she delay to assert by proper proceedings her claim to the premises?  On the day she became a State her right to Green River Island, if she ever had any, was as perfect and complete as it ever could be.  On that day, according to the allegations of her bill of complaint, Kentucky was claiming and exercising, and has done so ever since, the rights of sovereignty both as to soil and jurisdiction over the land.  On that day, and for many years afterwards, as justly and forcibly observed by counsel, there were perhaps scores of living witnesses whose testimony would have settled, to the exclusion of a reasonable doubt, the pivotal fact upon which the rights of the two States now hinge and yet she waited for over seventy years before asserting any claim whatever to the island, and during all those years she never exercised or attempted to exercise a single right of sovereignty or ownership over its soil.  It is not shown, as he adds, that an officer of hers executed any process, civil or criminal, within it, or that a citizen residing upon it was a voter at her polls, or a juror in her courts, or that a deed to any of its lands is to be found on her records, or that any taxes were collected from residents upon it for her revenues.

This long acquiescence in the exercise by Kentucky of dominion and jurisdiction over the island is more potential than the recollections of all the witnesses produced on either side. Such acquiescence in the assertion of authority by the State of Kentucky, such omission to take any steps to assert her present claim by the State of Indiana, can only be regarded as a recognition of the right of Kentucky too plain to be overcome, except by the clearest and most unquestioned proof.  It is a principle of public law universally recognized, that long acquiescence in the possession of territory and in the exercise of dominion and sovereignty over it, is conclusive of the nation's title and rightful authority.  In the case of *Rhode Island* v.

*Massachusetts,* 4 How. 591, 639, this court, speaking of the long possession of Massachusetts, and the delays in alleging any mistake in the action of the commissioners of the colonies, said: "Surely this, connected with the lapse of time, must remove all doubts as to the right of the respondent under the agreements of 1711 and 1718. No human transactions are unaffected by time. Its influence is seen on all things subject to change. And this is peculiarly the case in regard to matters which rest in memory, and which consequently fade with the lapse of time and fall with the lives of individuals. For the security of rights, whether of States or individuals, long possession under a claim of title is protected. And there is no controversy in which this great principle may be invoked with greater justice and propriety than in a case of disputed boundary."

Vattel, in his Law of Nations, speaking on the same subject, says: "The tranquillity of the people, the safety of States, the happiness of the human race do not allow that the possessions, empire and other rights of nations, should remain uncertain, subject to dispute and ever ready to occasion bloody wars.[1] Between nations, therefore, it becomes necessary to admit prescription founded on length of time as a valid and incontestable title." Book II, c. 11, § 149. And Wheaton, in his International Law, says: "The writers on natural law have questioned how far that peculiar species of presumption, arising from the lapse of time, which is called *prescription,* is justly applicable as between nation and nation; but the constant and approved practice of nations shows that by whatever name it be called, the uninterrupted possession of territory or other property for a certain length of time by one State excludes the claim of every other in the same manner as, by the law of nature and the municipal code of every civilized nation, a similar possession by an individual excludes the claim

---

[1] La tranquillité des peuples, le salut des États, le bonheur du genre humain, ne souffrent point, que les possessions, l'empire, et les autres droits des Nations, demeurent incertains, sujets à contestation, et toujours en état d'exciter des guerres sanglantes. 2 Vattel, ed. Pradier-Fodéré, (1863), 134.

of every other person to the article of property in question.' Part II, c. IV, § 164.

Potential as are the considerations drawn from the long silence and acquiescence of Indiana in the claim and pretensions of Kentucky, her affirmative action is not the less persuasive in favor of Kentucky's claim. It appears that on March 26, 1804, Congress authorized a survey into townships, six miles square, of the public lands north of the Ohio River and east of the Mississippi River. 2 Stat. 277, c. 35. Under this act a survey was made of the land in the vicinity of Green River Island in the month of December, 1805, and in April, 1806, and it did not include the island within the territory north of the Ohio, but treated the bank of the bayou or channel north of the island as the bank of that river. The notes of this survey were given in evidence and show conclusively that the officers of the government at that time did not consider the tract in controversy as forming any part of the territory of Indiana, but did consider that the waters of the Ohio River running north of it made the tract now in controversy an island of the river. This survey, from the time it was made, has been regarded as establishing the fact that the southern boundary of Indiana lies north of the island. It is now insisted that the lines of this survey were intended merely as meander lines run for the purpose of defining the sinuosity of the bank and the means of ascertaining the quantity of land then subject to sale, and was not intended as a boundary line of the island. Conceding, for the purposes of this case, that this is true so far as related to the fixing of the precise line of low-water mark, to which the territory of Indiana extended, it does not affect the force of the survey, as evidence that the island was not included within that territory, according to the judgment at that time of the surveying officers of the United States. With knowledge of this survey, the legislature of that State, on the 27th of February, 1875, passed an act entitled, "An act to ascertain the location of the boundary line between the States of Indiana and Kentucky above and near Evansville, and making the same evidence in any dispute." This act recited that difficulty and

dispute had arisen between the owners of land in Indiana and Kentucky in regard to the boundary line between the two States, and that such difficulty involved the title to large tracts of land above and near the line between Green River Island and the State of Indiana, and empowered and directed the Governor to select a commissioner, who should be a resident of the State and a practical surveyor, to act with a similar commissioner to be appointed by the Governor of Kentucky; and provided that the two commissioners so selected should make a survey of the line dividing the States, beginning at the head of Green River Island near and opposite to the mouth of Green River, and running thence down the Ohio River to the lower end of the island.

The second and third sections of this act are as follows :

" Sec. 2. In running said line the said commissioners shall consult and be governed by the surveys originally made by the government of the United States when such surveys are not inconsistent with each other, and they shall establish and mark proper monuments along said line, whereby the same may be plainly indicated and perpetuated.

" Sec. 3. Within ten days after making such survey and establishing said line, said commissioners shall reduce the same to writing, giving a full and plain description of all the courses and distances, and of the marks and monuments made and established, and sign and acknowledge the same before some officer authorized to take acknowledgments of deeds, which writing, so acknowledged, shall be recorded in the recorder's office in the counties of Vanderburgh and Warrick, and the original filed in the office of the Secretary of State, and such writing, or the record thereof, shall be conclusive evidence in any of the courts of this State of the boundary line between the States of Indiana and Kentucky, between the points on said Green River Island heretofore indicated."

An appropriation was also made for the survey.

An act of similar purport had been passed by the State of Kentucky on the 23d of April, 1873, authorizing the Governor of that State to appoint a surveyor to act with the person selected by the Governor of Indiana and make a survey of the

line. In pursuance of these acts the States each appointed a commissioner to survey the line. The commissioners accordingly, in 1877, made a survey, and ran a line on the north side of Green River Island, and also of the small tract known as Buck Island. In doing this, they followed the lines of the United States survey of 1806. By this survey both these islands were left within the State of Kentucky. Complaint being made of the action of the commissioners in running the line on the high bank, the Governor of Indiana directed the commissioner of that State to suspend any further action under the act, and subsequently visited Evansville, a city in Indiana, northwest of the island, and near the survey made, and examined the line of the survey, and in a subsequent letter to the commissioners stated that the line thus run did not in any part conform to the low-water mark of the river, but that the greater part was upon the bank, and the residue at a distance from it, leaving a tract of land between it and the river.

Subsequently the legislature of Indiana, upon the recommendation of the Governor, repealed the law authorizing the survey, and on the 14th of March, 1877, passed an act authorizing the Governor to enter into negotiations with the Governor of Kentucky for the acquisition from the latter State of all her rights of jurisdiction and soil over the Green River Island and her claim for any ground on the Indiana side of the river at said island, or to establish the line between the States by surveys, to be made in such manner as they might deem just; provided that the Governor of Kentucky should be authorized to enter into the agreement by the legislature of that State, and the consent of Congress should be obtained thereto. These efforts to adjust the boundary line failing, the Governor was authorized to direct the prosecution in this court of a suit for the purpose of determining and settling the boundary.

Now whilst no agreement between the States would be of any validity under the Constitution without the consent of Congress, and the survey made pursuant to the joint action of the two States would not have been legally binding even had it not been withdrawn before the report of the commissioners was filed in the offices designated in the acts, still the

law of Indiana authorizing the line to be fixed in accordance with the survey of the United States, and no other was made except the one in 1806, although the act speaks of surveys, was a plain recognition on her part that the boundary of the State was north of the island, though it was uncertain where the line should be drawn on the land, inasmuch as the channel of the bayou had been filled up. It is an admission entitled to great weight in explaining the cause of the State's general acquiescence, from the time it was admitted into the Union up to the passage of that act, in the claim and jurisdiction of Kentucky. Independently of the necessity of obtaining the consent of Congress to the execution of any agreement between the two States, it was competent for the State of Indiana to provide for a survey of a line already established, and to make such survey evidence in subsequent controversies upon the subject.

Whilst on the part of Indiana there was a want of affirmative action in the assertion of her present claim, and a general acquiescence in the claim of Kentucky, there was affirmative action on the part of Kentucky in the assertion of her rights, as we have seen by the law declaring the boundaries of her counties on the Ohio River, passed in January, 1810; and there was action taken in the courts of the United States and of the State by parties claiming under her or her grantor, and there was also action by her officers in the assertion of her authority over the land; all of which tends to support the claim of rightful jurisdiction. It at least shows that her claim was never abandoned by her or her people. On the 10th of February, 1784, Virginia issued a military land warrant to one John Slaughter. In March, 1785, Slaughter had a tract of six hundred acres surveyed, upon which he located a part of that warrant, and the tract was conveyed to him by the Commonwealth of Virginia on the 10th of February, 1790, by patent, in which the land was described by metes and bounds as lying in the district set apart for the officers and soldiers of the Virginia Continental line, on the first large island in the Ohio below the mouth of Green River. That island was Green River Island. In September, 1821, Slaugh-

ter's heirs, who were residents of Virginia, brought a suit in
ejectment in the Circuit Court of the United States for the
District of Kentucky, to recover the land conveyed to their
ancestor by this patent, against Garrett and others, who were
in possession.  The cause was not tried until 1834, when the
plaintiffs, who relied entirely upon the validity of the patent
to Slaughter, recovered judgment and were awarded restitu-
tion of the premises.  When the marshal went upon the land
to execute the writ for its possession, he was accompanied by
one Levi Jones, who claimed to have an equitable title under
Slaughter's heirs, and was there to receive possession.  Gar-
rett, one of the defendants, concluded to purchase one hun-
dred acres of the land upon which he was living from Jones,
and for part of the purchase-money executed to Jones his
note.  Jones assigned this note to James Rouse, who in turn
assigned it to Jackson McLean.  McLean brought an action
at law upon the note in the Circuit Court of Henderson
County, in Kentucky, in which he recovered judgment by de-
fault, and sued out a writ of execution, whereupon Garrett filed
a bill in equity in the same court, making Jones and Rouse
co-defendants with McLean, to enjoin the enforcement of the
judgment at law upon the following, among other, grounds :
First, that the process in the common law action had been
served upon him at his residence on Green River Island, which
was not within the territorial limits of the State of Kentucky,
but beyond the jurisdiction of the court, and that, therefore,
the service of process, judgment and execution were null and
void; second, that neither Jones, nor Slaughter, under whom
he claimed, had ever had a valid title to the land which Jones
had sold him, because the military land warrant upon which
Slaughter's patent had been issued could not be located upon
land which lay northwest of the Ohio and north of the mouth
of the Green River.  As evidence that the tract of land in
controversy lay in Indiana and not in Kentucky, he filed a
copy of the deed of cession from Virginia to the United
States as part of his bill.  The question of Kentucky's title
and right of jurisdiction over Green River Island was thus
put in issue and its decision was necessary to the determina

tion of the case. Several depositions were taken by each party upon the point, but, upon a full hearing of the case, Garrett's bill was dismissed, with costs and charges. Here were two adjudications, one by the United States Circuit Court and the other by a Circuit Court of the State, that Green River Island was within the jurisdiction of Kentucky. And the record shows that between 1818 and 1877 numerous grants of parcels of land on the island were made by Kentucky, and that between these dates taxes were assessed by her officers upon the lands as being within her territory and jurisdiction.

We have spoken of the character of the testimony introduced on the part of Indiana, and of the fact that it does not touch upon the condition of the channel above the island previous to her admission as a State into the Union. The testimony of the witnesses introduced by the State of Kentucky consisted to a great extent of recollections, which must of necessity have been more or less imperfect. They showed, as already stated, that in former times at some periods of the year there was a large volume of water which passed north of Green River Island, and that sometimes this volume continued throughout the whole year; but they also showed that at a very early period great changes had taken place in the channel north of the island, so that in some portions of the year it was easy to pass on foot from the island to the mainland.

The facts as they existed at the time of the cession of Virginia to the United States in 1784, and even at the time of the admission of Kentucky into the Union, have long since passed beyond the memory of man, and therefore cannot be established by oral testimony. As counsel says, the very grandchildren of men then living are now hoary with age. The facts can only be established as a matter of inference from general facts in regard to the condition of the country, and documentary evidence which in many cases rises little above that of hearsay; such as notices by travellers and maps given by them indicating the position of the tract in question. Of the latter it may be said that they all represent the tract as an island in the river.

Great changes in the bed of the river were to be expected from the immense volume and flow from its vast water-sheds. These water-sheds, according to the official report of the Tenth Census of the United States, cited by counsel, comprise over two hundred thousand square miles, and more than half of the water from them comes from east of Green River Island, and nearly all the great water-courses find their way to the Ohio River. That vast changes should be made in the channel of that river from the volume of water thus received, and its impetuous flow at certain seasons wearing away its banks deepening some portions of the stream and filling up others, was not surprising; and that where large vessels at one time could easily float should have become dry ground many years afterwards was but the natural effect of the tremendous forces thus brought into operation.

We have not deemed it important to take up the testimony of each of the numerous witnesses produced in the case by the States of Indiana and Kentucky. It would serve no useful purpose to attempt an analysis of the testimony of each, and to show how little and how much weight should be attributed to it. All the testimony is to be taken with many allowances from imperfect recollection, from the confusion by many witnesses of what they saw with what they heard, or of what they knew of their own knowledge with what they learned from the narrative of others. The clear and admitted facts we have mentioned, corroborated as they are by nearly everything of record presented, leave on our minds a much more satisfactory conclusion than anything derived from the oral testimony before us. The long acquiescence of Indiana in the claim of Kentucky, the rights of property of private parties which have grown up under grants from that State, the general understanding of the people of both States in the neighborhood, forbid at this day, after a lapse of nearly a hundred years since the admission of Kentucky into the Union, any disturbance of that State in her possession of the island and jurisdiction over it.

Our conclusion is, that the waters of the Ohio River, when Kentucky became a State, flowed in a channel north of the

tract known as Green River Island, and that the jurisdiction of Kentucky at that time extended, and ever since has extended, to what was then low-water mark on the north side of that channel, and the boundary between Kentucky and Indiana must run on that line, as nearly as it can now be ascertained, after the channel has been filled.

> *Judgment in favor of the claim of Kentucky will be entered in conformity with this opinion; and commissioners will be appointed to ascertain and run the boundary line as herein designated, and to report to this court, upon which appointment counsel of the parties will be heard on notice. And it is so ordered.*